UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE L. H., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security,[1] <br><br> Defendant. | Case No. 5:19-cv-00248-KES <br><br> MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

Plaintiff Michelle L. H. ("Plaintiff") applied for Social Security Disability Insurance Benefits in May 20, 2015, alleging that she became disabled and unable to work on February 10, 2014 (about one month after delivering her son), due to migraine headaches. Administrative Record ("AR") 162, 184.

On November 8, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

testified, as did a vocational expert ("VE"). AR 33-68. On March 12, 2018, the ALJ issued an unfavorable decision. AR 14-28. The ALJ found that Plaintiff's headaches were a severe, medically determinable impairment. AR 20. The ALJ further found that despite her headaches, Plaintiff had a residual functional capacity ("RFC") to perform light work with some non-exertional limitations, including "can concentrate for up to 2 hour periods of time, but limited to unskilled tasks in a non-public setting." AR 21.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work as an accounting clerk or esthetician, but she could perform the jobs of office helper, mail clerk, and routing clerk. AR 26-17. The ALJ concluded that Plaintiff was not disabled. AR 28.

## II.
## ISSUES PRESENTED

<u>Issue One</u>: Whether substantial evidence supports the ALJ's RFC determination. (Dkt. 18, Joint Stipulation ["JS"] at 3.)

<u>Issue Two</u>: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony. (JS at 4.)

Because Plaintiff's testimony, if credited, would constitute evidence that would factor into any RFC determination, the Court will address Issue Two first.

## III.
## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v.</u>

Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the district court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

# IV.

# DISCUSSION

## A. ISSUE TWO: Plaintiff's Subjective Symptom Testimony.

### 1. Summary of Plaintiff's Testimony.

Plaintiff was born in 1972. AR 162. She started experiencing headaches in her 20s (i.e., approximately the 1990s). AR 40. Nevertheless, between 2000 and 2013, she worked as an accounting clerk and an esthetician. AR 37, 185, 230.

Plaintiff stopped working in October 2013 due to her pregnancy. AR 37, 63, 184. Her son was born on January 1, 2014. AR 234. Before her pregnancy, she had six or seven migraines per month, and she called in sick to work "a lot." AR 40-41. During her pregnancy, she had only one or two migraines. AR 43. After her son was born, she had "an average of 20 to 25" headaches a month. AR 41. The week of her menstrual cycle, she was "guaranteed to have migraines every day." AR 41-42. The other headaches are on "scattered days throughout" each month. AR 42. "[A] lot of times" she would have headaches that lasted for as many as ten days straight, and those were not associated with her menstrual cycle. AR 42. On a typical day, she would wake up at 5:00 a.m. headache-free; she would try to "get as much as possible done" before something triggered a headache. AR 51. Her headaches "usually" started around mid-morning. AR 60.

3

In a typical week, there were only "one or two days where [she felt] good." AR 48.

This has been a steady pattern for the "the last two or three years." AR 41 (meaning approximately 2015 or 2016 through 2017). Her headaches have gotten "worse and worse" (meaning more frequent by about 3-5 per month) since she completed a Function Report in June 2015. AR 49-50.

Her migraine headaches cause her to feel dizzy and vomit. AR 44, 54. They can be triggered by light, sounds, and scents. Id. Her doctors tried treating her headaches by putting her on hormones to simulate pregnancy, but that made her condition "worse." AR 43. The only treatment she identified as effective was Botox injections, and that only provided about a month and half of relief (reducing headache days to 10-12 per month) when she first tried it.[2] AR 51-52. Taking Maxalt controlled the dizziness and vomiting, but she was incapacitated and needed to lie in bed due to pain. AR 59.

She testified that despite her headaches, she was able to be the primary caregiver for her son (age 3 at the time of the hearing) and drive him to and from half-day pre-school two days each week. AR 45. Her teenage stepdaughter arrived home each weekday at 2:45 p.m.; the stepdaughter or Plaintiff's husband cared for Plaintiff's son if they were home and Plaintiff was having a migraine. See AR 45-46. If she was alone in the house and needed to lie in bed with a headache, her son would play in his room or lie in bed with her. Id. On "a lot" of occasions, her mom would drive over to help with childcare. AR 46. When asked, however, "Have you had times where you have a headaches, where you're not able to care for the child?" she responded, "I mean no. Not really." Id. She added that "several" times, she had asked her husband to come home from work early or call-

---

[2] Plaintiff first tried Botox in May 2012. AR 1010. She reported the Botox helped "a lot," because she went 16 days without a migraine. AR 1022.

4

in sick.  AR 47.

She would go grocery shopping once a week.  AR 48.  On "several" nights each week, she could not cook dinner for her family.  Id.  Her husband and stepdaughter did a lot of household chores because "when [she has] a migraine, [she] cannot do anything."  AR 47.

In a Headache Questionnaire completed in June 2015, she reported 20 headaches per month that were so severe, she needed to stay in bed in a dark room with no light or sound.  AR 191.

In a Function Report also from June 2015, Plaintiff reported no problems with personal care.  AR 193.  She could do laundry and light cleaning, but only for a few hours each week.  AR 194.  When experiencing a migraine, she was dizzy and vomiting; she could only walk a few steps; and she was unable to drive.  AR 192, 197.  She had a driver's license, however, and she drove her son to and from pre-school, to medical appointments, and for weekly grocery shopping.  AR 56-57, 195-96.

**2. The ALJ's Treatment of Plaintiff's Testimony.**

The ALJ discounted Plaintiff's testimony about the limiting effects of her headache pain for reasons including (1) Plaintiff made inconsistent statements about her condition, (2) Plaintiff failed to follow prescribed treatment, (3) Plaintiff's testimony was inconsistent with her reported activities, and (4) her testimony lacked supporting medical evidence.  AR 23-25.

**3. Analysis.**

a.  Reason One: Inconsistent Statements.

Plaintiff summarizes her argument for disability benefits as follows: "Plaintiff claims that although she was able to work with her migraine headaches in the past, they have gotten progressively worse after giving birth in January 2014, and she is unable to return to the workforce."  (JS at 6.)  The ALJ found that Plaintiff had made inconsistent statements about this basic premise.  Specifically,

5

the ALJ contrasted Plaintiff's hearing testimony (i.e., that she had 6 or 7 headache days/month before her 2013 pregnancy when she was working, which spiked to 20 or 25 headache days/month after her son's January 2014 birth, per AR 40-43) with Plaintiff's treating records. AR 23. Those treating records, summarized in chronological order below, show that Plaintiff reported a similar number of headaches both before and after she stopped working, up until her last date of insured, which was December 31, 2015. See AR 19.

**Pre-pregnancy treatment records.**

• March 2011: Plaintiff reported 9 headaches/month around her menses, with no change in frequency since last visit. AR 866.

• August 2011: Plaintiff reported 10 or more headaches/month. AR 944. She was taking 9 Maxalt/month and did not feel it was enough. AR 952.

• September 2011: Plaintiff reported "really bad migraines the week of my period and the week after." AR 960.

• October 2011: Plaintiff reported about 15 headaches/month. AR 964. She was experiencing a migraine that had last 9 days straight. Id.

• November 2011: Plaintiff reported getting headaches since her early 20's, but worse in the last six months. AR 977. She developed headaches during her menses that would last "about 3 weeks" with nausea and vomiting. Id.

• December 2011: Plaintiff reported 14 headaches that month. AR 1005.

• January 2012: Plaintiff reported 12 headaches that month. Id.

• February 2012: Plaintiff reported 13 headaches that month. Id.

• March 2012: Plaintiff reported that as of March 16, she had already "had 11 migraine headaches" that month. AR 999. She reported, "My migraines are really bad and I am unable to work or do anything." AR 1001.

• May 2012: Plaintiff tried Botox and went 16 days without a migraine. AR 1022.

• December 2012: Plaintiff estimated that Botox had improved her

symptoms by about 50%. AR 1167.

**Post-pregnancy 2014-2015 treatment records.**

• February 2014: Plaintiff had post-partum checkups, and she did not mention debilitating headaches. AR 1879, 1894. She reported feeling "well, happy." AR 1880.[3]

• March 2014: Plaintiff reported, "I was doing Botox for my migraines and it really helped however I stopped when I got pregnant. … I am not getting them back." AR 1905. She reported that she was "home alone all day with [the baby, and] it's not very easy with my migraines." AR 1909.

• June 2014: Plaintiff reported "getting multiple migraines" and "migraines every day." AR 1943, 1957.

• August 2014: Plaintiff received Botox. AR 1965.

• October 2014: Plaintiff reported migraines during her period and ovulation. AR 2029.

• November 2014: Plaintiff received Botox and reported that her last Botox treatment provided 60% improvement. AR 2042-43. She reported headaches "10-15 days a month around menses." AR 2043.

• February 2015: Plaintiff received another Botox treatment, but she reported that the treatment had provided 0% improvement compared to before she began Botox. AR 2064; AR 2065 (saying treatment was "helpful" but she still had "a lot of headaches").

• April 2015: Plaintiff reported experiencing a migraine that lasted 8 days. AR 2074. She reported 14 migraines that month. AR 2079.

---

[3] Plaintiff's alleged onset date is February 10, 2014. AR 184. Plaintiff's post-partum checkups were on February 6, 2014, and February 19, 2014. AR 1880, 1894. If something about Plaintiff's headaches had changed causing Plaintiff to become disabled on February 10, the ALJ could fairly remark that it was odd Plaintiff had no complaints about headaches on February 19. AR 23.

7

- May 2015: Plaintiff reported having migraines "almost every day" and worrying that she was taking so much Maxalt that it was triggering them. AR 2097.
- June 2015: Plaintiff reported experiencing a migraine lasting 10 days. AR 2118. Plaintiff received another Botox treatment, and reported 20% improvement with the treatment. AR 2128.
- July 2015: Plaintiff reported experiencing a migraine lasting 4 days. AR 2142.
- August 2015: Plaintiff reported that for the last 2-3 months, she experienced migraines both the week prior to and the week of her menses, whereas before that, her migraines only increased the week of her menses. AR 2184. Later that month, she reported "almost daily" migraines. AR 2193. Her OBGYN prescribed birth control pills to address her headaches. AR 2198.
- September 2015: Plaintiff reported up to 19 headaches/month, characterizing this as "more . . . than ever." AR 2226. Her neurologist decided to stop the birth control prescription, because birth control pills "can trigger migraines." AR 2238.
- November 2015: Plaintiff reported experiencing a "rebound headache" from Maxalt. AR 2266.
- December 2015: Plaintiff received Botox treatment again. AR 2312.

**Post last-insured date 2016 treatment records.**

- January 2016: Plaintiff reported daily headaches. AR 2387.
- February 2016: Plaintiff reported an 8-day headache that she feared was a rebound headache. AR 2395. On 2/18/16, she received her second infusion treatment and denied headache pain before or after treatment. AR 2406. Later that month she had a 6-day headache. AR 2412.
- March 2016: Plaintiff reported "more frequent longer lasting headaches," but she also reported that "maxalt usually works well except when the Headache

lasts for several days." AR 2417-18.

- April 2016: Plaintiff reported having migraines "most days" and started taking Depakote. AR 2510-11. She later discontinued it due to nightmares. AR 2633.
- June 2016: Plaintiff reported "about 14 migraines/month." AR 2633.
- July 2016: Plaintiff resumed Botox treatments. AR 2672.
- August 2016: Plaintiff reported daily headaches. AR 2681. She emailed, "the week before and the week during my period the migraines have become unmanageable … lasting anywhere from 7 to 15 days straight." AR 2692.
- September 2016: Plaintiff reported "very bad migraines almost daily." AR 2714; AR 2720 ("headaches 2 to 3 wks a month" associated with menses); AR 2732 (hormones "normal").
- October 2016: Plaintiff received another Botox treatment and estimated that the treatments had helped 30%. AR 2739-40.
- November 2016: She reported a headache lasting 4-5 days, but "mild" pain because "she took Maxalt this morning." AR 2748. She also told Kaiser that she "works at home." Id.
- December 2016: Plaintiff received another Botox treatment and estimated that the last treatment had helped 25%. AR 2768. She reported headache frequency "before Botox" was "22 days a month"; after the last Botox treatment, "Daily x 10 days. Prior frequency was 15 days a month." AR 2769. Later that month, she reported "17 episodes of migraines a month." AR 2776.

***

This summary demonstrates that substantial evidence supports the ALJ's conclusion that Plaintiff made inconsistent statements about the degree to which her headaches worsened after her pregnancy. In 2011, while she was still working and before her alleged disability onset date in February 2014, Plaintiff was already reporting months with 13, 14, or 15 headache days. AR 964, 1005. She was

already reporting headaches that lasted for weeks at a time, corresponding with her menses. AR 977. In March 2012, she reported, "My migraines are really bad and I am unable to work or do anything" (AR 1001), but she was, in fact, working that month three 8-hour days/week at a day spa (AR 185).

By November 2014, Plaintiff reported headaches "10-15 days a month around menses" (AR 2043), and that was still true in April 2015 (AR 2079 [reporting 14 migraines that month].) Even as late as December 2016, she reported 17 episodes of migraines a month." AR 2776. Thus, the ALJ did not err in concluding that Plaintiff had made inconsistent statements about the frequency of her headaches while working and during her period of claimed disability. This alone would be a clear and convincing reason to discount Plaintiff's testimony. Generally, the ALJ reasoned that if Plaintiff was working before her alleged onset date, and the medical evidence did not show an increase in intensity and frequency of her headaches before her last insured date, that Plaintiff could have worked during the period of claimed disability. AR 23; see also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (claimant must prove disability before insured status expires).

     b. <u>Reason Two</u>: Failing to Follow Prescribed Treatment.

When asked about a medical record that suggested Plaintiff had taken a 2-week vacation in August 2015 (AR 2173), Plaintiff denied it and explained that she had lied about the vacation to get more medicine from her doctor. AR 58. The ALJ cited this as supporting the conclusion that "overuse of medication likely contributed" to some of her impairment, such as rebound headaches. AR 25; <u>see also</u> AR 52-53 (testifying that she is not supposed to take Maxalt every day, although she had at times, resulting in rebound headaches). It is probable that, as the ALJ concluded, Plaintiff's overuse of this medication contributed to her symptoms, and it is impossible to tell whether, without this overuse, Plaintiff would have suffered from such extensive headaches. The ALJ was permitted to

consider Plaintiff's failure to take her medication as prescribed. See Nacoste-Harris v. Colvin, No. 3:14-CV-01594-JO, 2015 WL 7012750, at *3 (D. Or. Nov. 12, 2015), aff'd sub nom. Nacoste-Harris v. Berryhill, 711 Fed. Appx. 378 (9th Cir. 2017) (holding that—where ALJ discounted testimony regarding limiting effects of migraine headaches, because physicians suspected rebound headaches due to overuse of narcotics and plaintiff discontinued migraine prophylactics—"failure to comply with a prescribed course of treatment may cast doubt on the veracity of a claimant's assertions of disabling symptoms").

     c. <u>Reason Three</u>: Testimony Inconsistent with Daily Activities.

The ALJ found that Plaintiff's testimony concerning the degree to which her headache pain interfered with her functioning was inconsistent with spending years as the primary caregiver for her young son. AR 23. The ALJ also noted that Plaintiff was able to drive, regularly prepare meals, and shop. <u>Id.</u>

Plaintiff argues that there is no true inconsistency, because she is functional "in between her headaches," and she does all these activities in between headaches. (JS at 11-12.) This explanation is inconsistent with the record. If Plaintiff had headaches that incapacitated her more than half of each month starting in the mid-morning, then she would not have been to drive her son home from pre-school in the afternoons regularly or prepare dinner for her family several nights a week. Plaintiff reported having headaches lasting up to 10 days at a time, which necessarily would have overlapped with her son's school schedule and weekly shopping. Yet she claimed that she could not drive during a migraine. This testimony is inconsistent.

Plaintiff next argues that because she received help from family members, she was "not responsible for caring for the young child on a full time basis as suggested by this Administrative Law Judge." (JS at 11.) Many new parents get some help from family members. This does not diminish the role of the primary caretaker. Plaintiff told her doctors that she was "home alone all day" with the

11

baby (AR 1909) and testified that even with headaches, there was never a time when she was unable to care for him (AR 46). Ultimately, the ALJ did not err in concluding that even if she had some help, Plaintiff's position as the primary caregiver for an infant/toddler was inconsistent with being incapacitated more than half of the time due to headaches.

The Court need not address the ALJ's fourth reason, because any error would be harmless. See Burch, 400 F.3d at 679 ("A decision of the ALJ will not be reversed for errors that are harmless.").

**B. ISSUE ONE: Plaintiff's RFC.**

Plaintiff argues, "[T]here is simply no way that Plaintiff could persist at work activity while suffering from a migraine headache," and as a result, she would miss "well in excess of 3 or 4 days" each month. (JS at 13.) The VE testified that such a high rate of absenteeism would preclude employment. AR 67. Plaintiff concludes from this that "the ALJ's failure to include any limitations pertaining to Plaintiff's inability to adhere to a normal work schedule in her residual functional capacity assessment constitutes reversible error." (JS at 13.)

The ALJ did not err by rejecting the premise that Plaintiff could not do any work activity while suffering from a migraine. Migraines may cause varying levels of impairment. As discussed above, the ALJ cited clear and convincing reasons for disbelieving Plaintiff's testimony about the level of impairment her migraines caused. Most workers have, at some point, worked through headache pain. A "normal" work schedule contemplates time off for holidays, sick leave, vacation days, and regularly scheduled breaks during the workday. The RFC further accommodated Plaintiff by only requiring up to two hours of concentration at a time. AR 21. Plaintiff engaged in substantial gainful employment for years despite suffering from migraines since her twenties and despite suffering from migraines at approximately the same rate while she was working as while she claimed disability, per the medical records summarized above.

# V.
# CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED: November 01, 2019

_____
KAREN E. SCOTT
United States Magistrate Judge